RECEIVED

APR 27 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____DEPUTY CLERK





IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

*1:16-CV-593 AWI EPG*

Willis Randolph

__(Name of Plaintiff)__

San Quentin

__(Address of Plaintiff)__

State Prison

vs.                                    COMPLAINT

States of California
Jim Obblissen, Katherine Hart
Bob Johansen - Pete Chavez

__(Names of Defendants)__

(Case Number)

I. Previous Lawsuits:

    A. Have you brought any other lawsuits while a prisoner:   ☑ Yes   ☐ No

    B. If your answer to A is yes, how many?: ____/____ Describe the lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper using the same outline.)

    1. Parties to this previous lawsuit:

    Plaintiff _Willis Randolph_

    Defendants _Robert Rainwater Jim Obblissen_ _Katherine Hart_

FORM TO BE USED BY A PRISONER IN FILING A COMPLAINT
UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983          Rev'd 5/99

1

2. Court (if Federal Court, give name of District; if State Court, give name of County)

Fresno Superior Court

3. Docket Number 11CEC G03746JH

4. Name of judge to whom case was assigned Dale Ikeda

5. Disposition (For example: Was the case dismissed? Was it appealed? Is it still pending?)
NO proof of Service Filed dismissed without perJudica

6. Approximate date of filing lawsuit March 2014)

7. Approximate date of disposition 2014

## II. Exhaustion of Administrative Remedies

A. Is there a grievance procedure available at your institution?    ☒ Yes    ☐ No

B. Have you filed a grievance concerning the facts relating to this complaint?
☒ Yes    ☐ No

If your answer is no, explain why not WRIT SuPemey
Appellent 5th, State Supreme Court California
(S-230933)

C. Is the grievance process completed?    ☐ Yes    ☐ No

## III. Defendants

(In Item A below, place the full name of the defendant in the first blank, his/her official
position in the second blank, and his/her place of employment in the third blank. Use item B
for the names, positions and places of employment of any additional defendants.)

A. Defendant Jim Obbligen is employed as Superior Court
Judge now He was DA at Fresno - Former District Attorney

B. Additional defendants Katharine Hart was Appeal Attorney
on direct Appeal Fresno, Bob Johansen Was
Sheriff Fresno Pete Chavez was A Sheriff
For Fresno County

IV.   Statement of Claim

(State here as briefly as possible the facts of your case.  Describe how each defendant is involved, including dates and places.  Do not give any legal arguments or cite any cases or statutes.  Attach extra sheets if necessary.)

In 1987 - Detective pete Chavez, Detective Bob Johansen, And District Attorney Jim Oppliger All Came up to Sacramento on Information By getting me to play me At the Scene of A crime By getting A Ron del helping who Notes Are To place me At A crime Scene And get me An white Jury And Jail house Informants And Beat me Around For A Long Time. This A Violation of A Federal Constitution And Civil Rights

V.   Relief.

(State briefly exactly what you want the court to do for you.  Make no legal arguments.  Cite no cases or statutes.)

I would Please Ask That This Civil Rights And Conduct Be Investigated To prove my Civil Rights Has Been Violated And The Record Prove This How These Detectives, And District Attorney Showed The such Prejudice By putting me A way. So Can so The didn't make me And That They All Be held Accountable For Violating my Civil Rights. And This under Color Violations pursuance Constitutions Civil Rights.

Signed this _____ day of _____, 20_____.

_____
(Signature of Plaintiff)

I declare under penalty of perjury that the foregoing is true and correct.

_____          _____
(Date)                                          (Signature of Plaintiff)

3

EXIT TO page (3)  IV

In 1987 Detective Bob Johansen And Detective Pete Chavez, And District Attorney Jim Obbligen who Came Again To San Joaquin This Time And Told me, Bob Johansen Had Arrested me 1975 AZ Case, Juvenile, Then 1976 A Rapes Case As Juvenile, Then In 1982 on Burglary Robbery Theft, He Said He Still Havent put me Away, So In 1988, Bob Johansen, pete chavez And Jim obbligen, Told my Executive Carla Dozlen 1986 They were put me Away for The Rest of my young Life, make me old, And Kids Be All Grown on A Crime unsolve and They Say They Had a Jay who Hates me Randall McKinney who will Say He Saw me At The Scene of The Crime without any proof, Just Racialy Due To my pass, my wiffe, who was white, I'm Black, In The Last Few years There Has Been Several Cases of Complaints under Investigations of murder Cases where Civil Rights And prejudice occured, under Head District Attorney Office Ed Hunt, And The prosecuter under Him who prosecuted This Codes, was Jim obbligen who Had Been In Los Angeles, Then Arizona, Then Fresno, where He Has A pattern of violation under Color.

SUPREME COURT
FILED

MAR 0 9 2016

Frank A. McGuire Clerk

Deputy

S230933

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

---

In re WILLIS RANDOLPH on Habeas Corpus.

---

The petition for writ of habeas corpus is denied.   (See *In re Robbins* (1998) 18 Cal.4th 770, 780; *In re Clark* (1993) 5 Cal.4th 750, 767-769.)

Kruger, J., was absent and did not participate.

CANTIL-SAKAUYE

*Chief Justice*

IN THE

## COURT OF APPEAL OF THE STATE OF CALIFORNIA

IN AND FOR THE

## FIFTH APPELLATE DISTRICT

> **Court of Appeal**
> **Fifth Appellate District**
> **ELECTRONICALLY FILED**
> *9:20 am, Nov 05, 2015*
> By: JZamorano

In re

WILLIS RANDOLPH,

On Habeas Corpus.

F072562

(Fresno Super. Ct. No. 379032-6)

**ORDER**

**BY THE COURT:**[*]

The "Petition for Writ of Habeas Corpus," filed on October 23, 2015, is denied. (*People v. Duvall* (1995) 9 Cal.4th 464, 474; *In re Walker* (1974) 10 Cal.3d 764, 774.)

_____ A.P.J.

---

[*] Before Levy, A.P.J., Poochigian, J., and Franson, J.

FILED

OCT 0 9 2015

FRESNO COUNTY SUPERIOR COURT
By_____
DEPUTY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO

CENTRAL DIVISION

| | |
|---|---|
| In re Willis Randolph, | ) No. 15CRWR682830 |
| Petitioner, | ) <br> ) Dept. 73 |
| On Habeas Corpus | ) <br> ) ORDER |

Having considered the petition for writ of habeas corpus filed on August 28, 2015, the Court finds that Petitioner has not stated a prima facie case for relief.

Petitioner presents four contentions in his petition for writ of habeas corpus. First, Petitioner maintains that Detective Bob Johnson subjected him to an unconstitutional search and seizure at San Quentin State Prison in 1987. Second, Petitioner argues that the prosecution engaged in racial bias during jury selection which resulted in an all-white jury being selected. Third, Petitioner contends that the jury was never informed that detectives told his wife that they were going to "put [him] away" and "take the kids." Fourth, Petitioner argues that the jury was never informed that the prosecution destroyed DNA evidence in 1988.

Initially, the Court notes that Petitioner has failed to attach a proof of service of his petition on the District Attorney of Marin County, where he is currently confined. Consequently, Petitioner has failed to attach a proper proof of service of his petition for writ of habeas corpus. (Pen. Code, § 1475.)

However, even had Petitioner attached a proper proof of service, the Court finds that Petitioner has raised similar and closely related claims in the numerous prior petitions, motions, and miscellaneous correspondence that he has filed with this Court. (See e.g., *In re Willis Randolph*, Case Nos. 676118-3, 676209-0, 07CRWR678418, 08CRWR678926, 08CRWR678986, 11CRWR680285, 11CRWR680588, 11CRWR680709, 12CRWR680857, 12CRWR681080.)

"It has long been the rule that absent a change in the applicable law or the facts, the court will not consider repeated applications for habeas corpus presenting claims previously rejected." (*In re Clark* (1993) 5 Cal.4th 750, 767.) In his current petition, Petitioner has not demonstrated a change in the applicable facts or law and Petitioner has not demonstrated that a fundamental miscarriage of justice would result from the failure to consider his current claims. (*In re Clark, supra,* 5 Cal.4th 750, 797.)

"The court has … refused to consider newly presented grounds for relief which were known to the petitioner at the time of a prior collateral attack on the judgment. [Citations.] The rule was stated clearly in *In re Connor, supra*, 16 Cal.2d 701, 705: 'In this state a defendant is not permitted to try out his contentions piecemeal by successive proceedings attacking the validity of the judgment against him.'" (*In re Clark, supra,* 5 Cal.4th 750, 767-768.) "Before a successive petition will be entertained on its merits the petitioner must explain and justify the failure to present claims in a timely manner in his prior petition or petitions." (*Id.* at p. 774.) "With the exception of petitions which allege facts demonstrating that a fundamental miscarriage of

justice has occurred …, unjustified successive petitions will not be entertained on their merits." (*Id.* at p. 775.)

Here, Petitioner has failed to explain or justify his failure to present his current claims in his prior petitions for writ of habeas corpus that he has filed with this Court. Consequently, the petition for writ of habeas corpus is denied.

DATED this 9th day of October 2015.

**W. KENT HAMLIN**

_____
W. Kent Hamlin
Judge of the Superior Court

BOARD OF PAROLE HEARING                                    STATE OF CALIFORNIA
LIFE PRISONER HEARING –
EXTRAORDINARY ACTION AND DECISION

FOR BOARD USE ONLY

# DECISION / ORDER

## GIVE UP RIGHT TO ATTEND THE HEARING

[ ] Granted – YES, the hearing will be held without prisoner.
[ ] Denied – NO

## CHOOSE TO WAIVE HEARING

[ ] Granted – YES, the waiver is approved for the time requested.
[ ] Denied – NO:
    [ ] The request is on time, but it is not a reasonable request
    [ ] The reason for the request should have been known 45 days before the hearing
    [ ] The request is late, and the reason for the request is not good enough

Reasons/Comments: _____

_____

## NOT SUITABLE FOR PAROLE (Stipulation)

[✓] Granted – YES, there is a good reason to not hold the hearing for the time requested.
[ ] Denied – NO, the request is not reasonable

Reasons/Comments: _Inmate needs additional time to create distance_
_with (2) 1155, attain additional self-help programming and_
_a decision from the Innocence Project._

## POSTPONE HEARING

[ ] Granted – YES, there is a good reason to postpone. Postpone for _____ [months/years].
[ ] Denied – NO:
    [ ] Prisoner did not make his or her best effort to get the information, or information not essential
    [ ] Prisoner should have made the request sooner

Reasons/Comments: _____

_____

Approval by BPH Official(s):

| Signed: | | Title: Commissioner | Date: 8/27/13 |
| Signed: | | Title: Deputy Commissioner | Date: 8/27/13 |

| NAME | CDC# | PRISON | CALENDAR | DATE |
| RANDOLPH, WILLIS | E47241 | CSP-SOL | | |

BPH 1001(a) (REV. 12/08)                                                      Page 4 of 6

WILLIS RANDOLPH, Petitioner-Appellant, v. PEOPLE OF THE STATE OF CALIFORNIA; ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, JAMES HAMLET, Warden, Respondents-Appellees.

No. 03-16004

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

Randolph v. California, 380 F.3d 1133 (9th Cir. 2004); 2004 U.S. App. LEXIS 17470

April 14, 2004, Argued and Submitted
August 19, 2004, Filed.

PRIOR HISTORY: [**1] Appeal from the United States District Court for the Eastern District of California. D.C. No. CV-93-05604-REC. Robert E. Coyle, Senior Judge, Presiding.

DISPOSITION: AFFIRMED in part, VACATED in part, and REMANDED.

CASE SUMMARY:

PROCEDURAL POSTURE: Petitioner, a California inmate, sought review of a judgment from the United States District Court for the Eastern District of California, which denied his petition for a writ of habeas corpus challenging his state court conviction for murder.

OVERVIEW: After petitioner's first trial ended in a jury hung, petitioner was convicted on retrial where the prosecutor had the benefit of two additional witnesses who were jailhouse informants. One informant, petitioner's cellmate, testified that petitioner confessed the murder. The court vacated the district court's decision that petitioner's Sixth Amendment rights under Massiah were not violated. The court concluded that the cellmate was acting on behalf of the State when he was put back in the cell after meeting with the district attorney and a detective. The court remanded for further factfinding because two critical factual issues related to timing and to the cellmate's behavior were not properly considered by the district court. Thus, the court could not determine whether a Massiah violation occurred. The court rejected petitioner's contention that there was a systematic exclusion of Hispanics in the jury selection process. The court also found no violation of petitioner's due process rights in the state trial court's failure to change venue or in the admission of the informants' testimony. Defense counsel's cross-examination was strenuous, and a cautionary instruction was given.

OUTCOME: The court vacated the district court's denial of petitioner's Massiah claim and remanded the action for further factfinding. The court affirmed the district court's denial of petitioner's other claims.

COUNSEL: Suzanne Adele Luban, Oakland, California, for the petitioner-appellant.

Janis Shank McLean, Office of the California Attorney General, Sacramento, California, for the respondents-appellees.

JUDGES: Before: Thomas G. Nelson, William A. Fletcher, and Marsha S. Berzon, Circuit Judges. Opinion by Judge William A. Fletcher.

OPINIONBY: W. FLETCHER

OPINION: [*1138] W. FLETCHER, Circuit Judge:

Petitioner Willis Randolph appeals the district court's denial of his petition for a writ of habeas corpus challenging his 1986 state court conviction for murder. We hold that if the State places a cooperating informant in a jail cell with a defendant whose right to counsel has attached, and if the informant then makes a successful effort to stimulate a conversation with the defendant about the crime charged, the State thereby violates the defendant's Sixth Amendment rights under Massiah v. United States, 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199 (1964). Because the district court failed to make proper factual [**2] findings, we vacate the district court's denial of Randolph's Massiah claim and remand for factfinding. We do not decide the part of Randolph's claim under Brady v. Maryland, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), that depends on the district court's finding of fact necessary for the Massiah claim. We affirm the district court's denial of Randolph's other claims.

I. Background

Petitioner Randolph is currently serving a life sentence for his conviction for the murder of 10-year-old Lamont Collins on June 24, 1981. The police initially suspected Lamont's father, who had expressed unhappiness at paying child support and had threatened Lamont's mother. Police, however, were unable to discover sufficient evidence of the father's involvement to justify bringing charges against

# Additional Documents Information That The Jury Did Not Hear or Know

Case 1:16-cv-00593-AWI-EPG    Document 1    Filed 04/27/16    Page 12 of 68

1987 When I was In Sanquentin on 4 Years Bungloং conviction, Detective Bob Johanson And Detective Pete Chavez Had Been Talking To me on The phone, I would Call From Alpine unit, To- (209) 488-3922 They were Talking To me About Another Bunglary, Then After About 6 months, After They Had met my wife, who is white, I'm Black, They were Coming up To Sanquentin 1987, now Telling me This Guy You Grew up with is Saying He Saw you were A murder of A little Boy was Found, The Guy was Randull McKinney, whom I went To Elementar্ school, I curse His mother out And later In The years 1980, I did A Bunglary at Their Home with Couple Others, This was Never Brought up in Front of A Jury or Court, This guy Randall Mckinney Hated me For That and in 1986 He saw me with my wife who is white, He's White And I'm Black (She was) Preznont with my Daughter noelle is now 29 years, This was At The marty Store on mount whitny Garfield, He gave me A look like I Never Seen, The next Time I saw Him was in Court on The witness Stand, After I Had Been ARRested By The Same Detectives who got A illegal Search warrant To Arrest me And Tell me we got you now, They kept me IN Jail About 3 years -1987-1990, But was convicted Dec 1989, They Had Built A wrong Fally Racially Case, By Having A Hung Jury, Second Trial, They Had All white Jury, who Tell you Jury Emory He's Black He's guilty, Jury DA Roths Foreman, Excludes Black Jurs on Jury pool, Jail House Informants, Destroyed DNA Evidence, All This proof is Attach. Bunglary Conviction, marrige certificate, County Jail, How They Come And Arrested me, News paper, And Document news 24 with my wife Saying I'm Being Arrested wrongly.

Additional Information For The Court

I Never was Aware of How my Appeal Attorneys Done me until, 2014 when The Innocent project in Santa Clara Sent my Brief And Transcripts, Back To me To CMF Vacaville, whom my Attorney John Cotten Had contacted About my Innocents, And They look And Read And Sent Them Back 2014 And Said your DNA was Destroyed, SoYou gonna Have To Bring This up In The Federal Courts - 12 Boxes of Legal work, And All These Attorney on Appeal knew my Education was Slow And Starting From - Appeal Attorney Karine Hunt, Look At The issue She Raised, look At That And when I was in Federal Court on Appeal, I Didn't know ANYTHING About The Appeals or what These Attorney Have Done To me, But when Senate Bill·1058 Penal Code 1473.(A)(D) I Said I Have To Start Back To Superior Court, Exhaust my Remedies Back To Federal Court To Show Them with These issues That Never was Raised By my Attorney who knew This was A wrongful Conviction, letter From John Cotten Federal Attorney you were A Victim in This Case, News paper when I was Convicted Jim Bobkien - D·A· - Public Defender - Robert Rain water A Innocent man will get out one Day, Constitutional Violation of A Innocent man! (Turn Back side)

Case 1:16-cv-00593-AWI-EPC   Document 1   Filed 04/27/16   Page 13 of 68

Case 1:16-cv-00593-AWI-EPG Document 1 Filed 04/27/16 Page 14 of 68

| 06/25/2013 | 1 | Application for leave to file a second or successive petition filed. (MOATT) [8680713] (HC) |
| 11/18/2013 | 2 | Received letter from pro se re: status report(sent docket sheet) [8868878] (JFF) |

Actual Innocence - House v Bell -2006
547 US. 518, At 538-539
Schlup v Delo, 1995 513 U.S. 298, 330

QUESTION(S) PRESENTED

Im Victim of Fundamental misconrioage of Justice which meets The Course And Prejudica Standard I pray That This High Court Review This Case, The Public Defender I Had Two Trial Knew I was Innocent, He Detroyed Evidence DNA And other Suspects Could not Be Tested under 1988 DNA proper Attack, And under United States Supreme Court - My First Trial was A Hang Jury - with Jail House informants And Detroyed Evidence By my Public Defender Prosecution Attorney Jim obblaggar, And Fresno Sherriff Department, Second Trial was All white Juny Im A Black Man who was wrongly Convicted Due Tony low Education and Juvenile Record, They Chose me for this Cold 1981 Case.

Please Court Review This 1981 murder case, I'm A Victum of CRIme, Civil Rights Violated, BIII ARIghts, Two TRials, Two Appeals, Two Evidenciary Hearing, I'm StIII InconSounded. At 56 yus old, ImpRisonced 1986,

Case 1:16-cv-00593-AWI-EPG Document 1 Filed 04/27/16 Page 16 of 68

Constitutional) Cases Cited
Innocent, wrongfully, convicted
United States Supreme Court
See House v, Bell (2006) 547
U.S. 518 At 538-539 ~ 1065
Schlup V, Delo, (1995) 513 U.S. 298, 330.
S.B Senate Bill - 1058
Penal Code 1473 (a)(b)

All The Testing That was Done By
Forensic Test~TRt-393· 1162-1164 ·1171-1173 ·TRt·1124
1125·1129 · 1164-1165· To Eliminate me; I was still
Convicted in The Second TRial By All white Jury
who Says on Attach By one of The Jury; F Hés Black
Hes guilty And The Jury pool Excluded Any Black
To sit on my Jury TRial And They Also Use Jail
House Informants Second TRial Who Have
Recanted-Ronnie Moore, Jackie Konikle,

# Additional Court Information

(pg)(pg)

I'm Appealing The Case no 15CRWR682830 Dept 93-Oct 9,15 The Court Said I Failed To Attach A proof of Service, on The District Attorney In Marin County where I'm Confined And A proof of Service on This writt, And Also I'm Appealing The Issues That is Raised In This petition never Have Been In This 5th Appellant Court, And under Senate Bill 1058 And penal Code 1473(A) I can prosecute A writt under false Conviction, Factually Innocent, my Case is A Racially Conviction And These Are The Issues Attach never Been presented, And There is Bias And discrimination In That Court Room Against me, In Fresno Superior Court, Judge Jim Obbiggen was my Prosecuton At The Time And I'm Asking The Court To Look Into This For Change of Venue, For Fain Hearing on these claims That I Just Filed under This new Bill-Senate 1058- penal Code 1473(A)(b) And Documents Attach proof of That Conviction.

Attach Additional (Pg 2)

These Claims Are Brought up now, Due
There is A Senate Bill 1058 And A Penal
Code 1473(A)(D) I Can Bring These Claims up
Due To my wife At The Time Detective Bob
Johansen And Randall McKinney, District
Attorney, They All Saw Her She was white
1986 And Told To Her And Told Her They
were Gonna put me Away She was pregnant,
with noelle, Randall mckinney, Bob Johansen
pete chavez, All From The Fresno County Rivadale
Area They Had To Racially Falsely get me
A District Attorney who will Falsely put
me Away with Fabricated Testimony, The
Record proves Im Innocent And A
Victum, when They Arrested me In Sanguinator
Defective chavez Them, who Had All Told my wife
The child Services      Had Taken noelle Randolph
From Conla And I Had To Go To Juvenile Count Hearing
2988, Even The parole Board In 2013 wrote A
Recomend them, For A Innocent Review Attach

Additional Information

(pg 3) The Crime of murder they put on me was out of madera I'm from Riverdale a Town 5 miles called Lanare And Fresno Superior Court, And Detectives And publicity By Slantearby My Foce And name All over The TV To Racially Convicted me A foreman Juny Now Rhodes Rodes Admitted They knew About my family I Had A public Defender who The DA And Court Battled Two Treals And convicted me wrongly Falsely, And I Have Served This whole Life Sentence And I would Ask This Court Remand me Back ~~~~~~ OR Throw This Conviction out, under Senate Bill 1058 And 1473 (A) (d) And Appoint Counsel

(Benifside)

Additional Documents In Addition
~~To~~ So Help me God I'm Innocent, Praying
I'm Asking For Relief on These Issues
Never Raised In The [State Supreme] Court
~~None~~ of These Issue were close To Similar
in The Superior Court And Appellant, I~~~~ Exhaust
Remedies All The way Back Raising SB-1058
~~~~ Falsly Convicted, 1473 False testimony
Actually Innocent claim, That Have Never
Been in This Court Room, And I'm Asking
And praying For Justice of Relief
Appointment of Counsel, Evidenciary
Hearing on This Conviction Be Reversed
On wrong fully Convicted, False testimony,
=actually Actually Innocent-Racially Convicted
Back in 1989, By All white Jury, witnesses
who Hated me, For my Race, And under SB 1058
penal Code 1473-Laws That I Can Bring
This wrongfully Convictions Im poor, Low Educated,
Had public Defender, And The Record show This
what Happen To me, Back 1989 Two Trials, False
Testimony of Informants, and All white Jury,
FresNo Superior Court-Judge Frankie OReede, District Attorney
Jim OBoligger, public Defender Robert Ruinwater, I would
Please Ask For Change venue, This Court, At The Time
They would Exclude Black Jury,

**DECLARATION OF SERVICE BY MAIL**
**BY PERSON IN STATE CUSTODY**
(C.C.P. §§ 1013(A), 2015.5)

I, _Willis Randolph_, the undersigned, declare:

I am over the age of 18 years, and _____ a party to this matter.  I am a resident of
SAN QUENTIN STATE PRISON, in the County of Marin, State of California. My
Prison address is: _CSP San Quentin_,
CDCR#: _E47241_, CELL#: _West Block-204_
SAN QUENTIN STATE PRISON
SAN QUENTIN, CA 94974

On, _10-19-15_, I served the attached:

_Writt Habeus Corpus And_
_Documents_

on the parties, at the addresses listed below, by placing true and correct copies
thereof, enclosed in a sealed envelope (verified by prison staff) with postage fully
prepaid, in a deposit box provided by San Quentin State Prison, for mailing in the
United States Mail as per the regulations governing out-going Legal Mail.

_Marin County District Attorney_
_Superior Court of Justice, P.O. Box_
_4988 San Rael. Ca 94913- And The Fifth_
_Appellant District Court 2424-Ventura St_
_Fresno Calif 93721_

I declare under the penalty of perjury, under the laws of the State of California, that
all the foregoing is true and correct.

Executed on _10-19-15_, at San Quentin, State California.

_Willed Randolph_
Declarant

a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.' Slack, 529 U.S. at 484, quoting Barefoot, 463 U.S. at 893, and n. 4 . Because "jurists of reason" would find it debatable whether the district court was correct in its interpretation and application of the evidence as to these two claims, petitioner should be permitted to appeal the district's denial of each.

## CONCLUSION

Petitioner submits that he has established entitlement to a CPC (or a COA) as to the claims of error proposed to be raised on appeal. Accordingly, this Court should grant the CPC as to both claims.

## REQUEST FOR APPOINTMENT OF COUNSEL

Petitioner requests this Court to appoint the undersigned to represent him in this appeal pursuant to the Criminal Justice Act. The district court granted in forma pauperis status to petitioner for the appeal. However, the district court deferred the request for appointment of counsel to this Court, apparently because the district judge believed it had no further jurisdiction to appoint counsel for the appeal. The court stated: "Petitioner's request for appointment of counsel must be dismissed. As noted above, judgment was entered in this case on May 9, 2008, and the matter before this Court is terminated. Petitioner is advised that he may renew his motion before the Ninth Circuit Court of Appeals." (5/21/08 Order.)

Petitioner is a developmentally disabled man with a 59 I.Q., who has been diagnosed as having brain damage and mental retardation. He has been incarcerated in state prison since at least 1988. While he is able to read and write, Mr. Randolph is not capable of representing himself at any stage of these legal proceedings. His family is unable to afford the cost of retaining counsel. The district court has appoint counsel at every stage of the habeas proceedings, including the prior appeal.

11

SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO

CENTRAL DIVISION

In re WILLIS RANDOLPH                    )     No. 12CRWR680857
                                         )
         Petitioner,                     )
                                         )     Dept. 62
                                         )
On Habeas Corpus                         )     ORDER DENYING WRIT OF
                                         )     HABEAS CORPUS
                                         )

Having considered the petition for writ of habeas corpus filed on April 9, 2012, the court finds that Petitioner has not stated a prima facie case for relief.

Petitioner challenges his 1989 conviction for first degree murder, alleging his innocence. Petitioner contends that a fundamental miscarriage of justice will occur if the court does not reach the merits of the claims. Petitioner also wants the court to conduct an evidentiary hearing because Petitioner alleges that his trial counsel was ineffective.

However, Petitioner provides no new evidence to support his claim that a fundamental miscarriage of justice would occur if the court denies the petition as successive. (People v. Duvall (1995) 9 Cal. 4th 464, 474 [citing People v. Gonzalez (1990) 51 Cal.3d 1179, 1260.].) Further, the court finds that this petition is duplicative to several habeas writs filed by Petitioner in 2008 and 2011. (See In re Willis Randolph, Case Number 11CRWR680709,

*In re Willis Randolph,* Case Number 11CRWR680588; *In re Willis Randolph,* Case Number 08CRWR678986; and *In re Willis Randolph,* Case Number 08CRWR678926.)

"It has long been the rule that absent a change in the applicable law or the facts, the court will not consider repeated applications for habeas corpus presenting claims previously rejected." (*In re Clark* (1993) 5 Cal. 4th 750, 767.) As this petition does not demonstrate a change in the applicable facts or law and Petitioner has not demonstrated that a fundamental miscarriage of justice would result from the failure to entertain the claims, the court declines to consider Petitioner's claims. (*Clark*, 5 Cal. 4th at 797.)

The petition is denied.

DATED this __18th__ day of June, 2012.

ARLAN L. HARRELL

Arlan L. Harrell
Judge of the Superior Court

Case 1:16-cv-00593-AWI-EPG   Document 1   Filed 04/27/16   Page 26 of 68

| SUPERIOR COURT OF CALIFORNIA • COUNTY OF FRESNO<br>Criminal Department, Central Division<br>1100 Van Ness Avenue<br>Fresno, California 93724-0002<br>(559) 457-1801 | *FOR COURT USE ONLY*<br>FILED<br>MAR 17 2014<br>FRESNO SUPERIOR COURT<br>By _____<br>DEPUTY |
|---|---|
| TITLE OF CASE:<br>**In re Willis Randolph** | |
| **CLERK'S CERTIFICATE OF MAILING** | CASE NUMBER:<br>**13CRWR681797** |

I certify that I am not a party to this cause and that a true copy of the **Order** was placed in a sealed envelope and:

☐ ˙ Deposited with the United States Postal Service, mailed first class, postage fully prepaid, addressed as shown below.

☒ Placed for collection and mailing on the date and at the place shown below following our ordinary business practice. I am readily familiar with this court's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service with postage fully prepaid.

Place of mailing: **Fresno, California  93724-0002** on:

Date: **March 17, 2014**          Clerk, by _____, Deputy
                                                              J. Tankersley

**Willis Randolph #E-47241**
**California State Prison, Solano**
**P.O. Box 4000**
**Vacaville, CA 95696-4000**

☐ Clerk's Certificate of Mailing Additional Address Page Attached

FILED

MAR 1 7 2014

By _____
                              DEPUTY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO

CENTRAL DIVISION

In re Willis Randolph,          )   No. 13CRWR681797
                                )
        Petitioner,             )   Dept. 62
                                )
On Habeas Corpus                )   ORDER
                                )
                                )
                                )

On January 21, 2014, Petitioner filed a letter requesting reconsideration of the Court's December 13, 2013 denial of his petition for writ of habeas corpus.

However, Petitioner's request for reconsideration is improper. "Since under section 1506 there is no appeal from the denial of habeas corpus, the sole and proper remedy after denial of a petition for writ of habeas corpus by a superior court is to file a new petition with the Court of Appeal, which has original jurisdiction in habeas corpus matters." (*In re Reed* (1983) 33 Cal.3d 914, 918 n. 2, *overruled on other grounds in In re Alva* (2004) 33 Cal.4th 254.) Consequently, Petitioner's request for reconsideration is denied.

DATED this __17th__ day of __March__ 2014.

ARLAN L. HARRELL
_____
Arlan L. Harrell
Judge of the Superior Court

COUNTY OF FRESNO
Fresno, CA

F-072662

Fresno Super ct No. 3790326
Order

The petition for Writ of Habeas Corpus
Filed Oct 23,15 is denied
People V DuVall (1995) 9 Cal 4th 474;
In Re Walker (1974) 10 Cal. 3d 764, 774.)

The New issue Never was Raised
in Federal Court under New SB 1058
penal Code Law 1493 (C)

Apc J. 607 - Nov 5, 2015
FIFTh Appellant

S207194

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

---

In re WILLIS RANDOLPH on Habeas Corpus.

---

The petition for writ of habeas corpus is denied. (See *People v. Duvall* (1995) 9 Cal.4th 464, 474.)

SUPREME COURT
FILED

FEB 2 0 2013

Frank A. McGuire Clerk

Deputy

CANTIL-SAKAUYE
*Chief Justice*

No. _____

IN THE SUPREME COURT OF THE UNITED STATES

WILLIS RANDOLPH, Petitioner

v.

THE STATE OF CALIFORNIA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, JOHN W. HAVILAND, WARDEN, Respondents.

Petition For Writ of Certiorari to the United States Court of Appeals, Ninth Circuit

Petitioner, Willis Randolph, respectfully asks that a writ of certiorari issue to review the judgment and opinion of the United States Court of Appeals, Ninth Circuit, filed on September 23, 2011 (see Appendix[1] A). The timely-filed[2] petition for rehearing was denied by the court of appeals on October 12, 2011 (see Appendix E).

## OPINION BELOW

The opinion of the United States Court of Appeals, Ninth Circuit, which was unpublished, was filed on September 23, 2011 (see Appendix A).

---

[1] Appendix items (A-J) are not attached hereto, but are separately bound.

[2] Due to a change in counsel of record after the issuance of the opinion of the court of appeals, new counsel requested and was granted an extension of time to timely file the petition for rehearing, which document was later timely filed within the new timeframe.

1.

**FILED**

FEB 27 2014

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| WILLIS RANDOLPH, | No. 13-72247 |
| Petitioner, | |
| v. | ORDER |
| GARY SWARTHOUT, Warden, | |
| Respondent. | |

Before:   ALARCÓN, O'SCANNLAIN, and FERNANDEZ, Circuit Judges.

The application for authorization to file a second or successive 28 U.S.C.

§ 2254 habeas corpus petition in the district court is denied. Petitioner has not

made a prima facie showing under 28 U.S.C. § 2244(b)(2) that:

> (A) the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

No petition for rehearing or motion for reconsideration shall be filed or

entertained in this case. *See* 28 U.S.C. § 2244(b)(3)(E).

Case 1:16-cv-00593-AWI-EPG   Document 1   Filed 04/27/16   Page 32 of 68

General Docket
United States Court of Appeals for the Ninth Circuit

| **Court of Appeals Docket #:** 13-72247 | **Docketed:** 06/25/2013 |
|---|---|

Willis Randolph v. Gary Swarthout
**Appeal From:** U.S. District Court for Eastern California, Fresno
**Fee Status:** Not Applicable

**Case Type Information:**
 1) original proceeding
 2) second/successive habeas corpu
 3) 2254 habeas corpus

**Originating Court Information:**
 District: 0972-1 :
 **Date Rec'd COA:**
 06/24/2013

**Prior Cases:**
 08-16275   **Date Filed:** 05/28/2008   **Date Disposed:** 09/23/2010   **Disposition:** Affirmed - Memorandum

**Current Cases:**
 None

| WILLIS RANDOLPH (State Prisoner: E-47241)<br>            Petitioner,<br><br>v.<br><br>GARY SWARTHOUT, Warden<br>            Respondent, | Willis Randolph<br>[NTC Pro Se]<br>CSP - CALIFORNIA STATE PRISON<br>(SOLANO)<br>P.O. Box 4000<br>Vacaville, CA 95696-4000 |
|---|---|

WILLIS RANDOLPH,

            Petitioner,

v.

GARY SWARTHOUT, Warden,

            Respondent.

WILLIS RANDOLPH, Petitioner-Appellant, v. PEOPLE OF THE STATE OF CALIFORNIA; ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, JAMES HAMLET, Warden, Respondents-Appellees.

No. 03-16064

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

Randolph v. California, 380 F.3d 1133 (9th Cir. 2004); 2004 U.S. App. LEXIS 17470

April 14, 2004, Argued and Submitted
August 19, 2004, Filed

PRIOR HISTORY: [**1] Appeal from the United States District Court for the Eastern District of California. D.C. No. CV-93-05604-REC. Robert E. Coyle, Senior Judge, Presiding.

DISPOSITION: AFFIRMED in part, VACATED in part, and REMANDED.

CASE SUMMARY:

PROCEDURAL POSTURE: Petitioner, a California inmate, sought review of a judgment from the United States District Court for the Eastern District of California, which denied his petition for a writ of habeas corpus challenging his state court conviction for murder.

OVERVIEW: After petitioner's first trial ended in a jury hung, petitioner was convicted on retrial where the prosecutor had the benefit of two additional witnesses who were jailhouse informants. One informant, petitioner's cellmate, testified that petitioner confessed the murder. The court vacated the district court's decision that petitioner's Sixth Amendment rights under Massiah were not violated. The court concluded that the cellmate was acting on behalf of the State when he was put back in the cell after meeting with the district attorney and a detective. The court remanded for further factfinding because two critical factual issues related to timing and to the cellmate's behavior were not properly considered by the district court. Thus, the court could not determine whether a Massiah violation occurred. The court rejected petitioner's contention that there was a systematic exclusion of Hispanics in the jury selection process. The court also found no violation of petitioner's due process rights in the state trial court's failure to change venue or in the admission of the informants' testimony. Defense counsel's cross-examination was strenuous, and a cautionary instruction was given.

OUTCOME: The court vacated the district court's denial of petitioner's Massiah claim and remanded the action for further factfinding. The court affirmed the district court's denial of petitioner's other claims.

COUNSEL: Suzanne Adele Luban, Oakland, California, for the petitioner-appellant.

Janis Shank McLean, Office of the California Attorney General, Sacramento, California, for the respondents-appellees.

JUDGES: Before: Thomas G. Nelson, William A. Fletcher, and Marsha S. Berzon, Circuit Judges. Opinion by Judge William A. Fletcher.

OPINIONBY: W. FLETCHER

OPINION: [*1138] W. FLETCHER, Circuit Judge:

Petitioner Willis Randolph appeals the district court's denial of his petition for a writ of habeas corpus challenging his 1986 state court conviction for murder. We hold that if the State places a cooperating informant in a jail cell with a defendant whose right to counsel has attached, and if the informant then makes a successful effort to stimulate a conversation with the defendant about the crime charged, the State thereby violates the defendant's Sixth Amendment rights under Massiah v. United States, 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199 (1964). Because the district court failed to make proper factual [**2] findings, we vacate the district court's denial of Randolph's Massiah claim and remand for factfinding. We do not decide the part of Randolph's claim under Brady v. Maryland, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), that depends on the district court's finding of fact necessary for the Massiah claim. We affirm the district court's denial of Randolph's other claims.

I. Background

Petitioner Randolph is currently serving a life sentence for his conviction for the murder of 10-year-old Lamont Collins on June 24, 1981. The police initially suspected Lamont's father, who had expressed unhappiness at paying child support and had threatened Lamont's mother. Police, however, were unable to discover sufficient evidence of the father's involvement to justify bringing charges against

adopting in full the magistrate judge's Findings and Recommendations ("F&R's") issued on February 28, 2008. In the denial order, the district court preemptively denied a COA.[1]

Petitioner seeks a CPC from the judges of this Court. See In re Burwell, 350 U.S. 521 (1956) (request for certificate of probable cause is deemed directed to judges of the Court of Appeal if filed in that court).

This is Mr. Randolph's second appeal in this §2254 case. In 2002, after holding a three-day evidentiary hearing, the magistrate judge issued Findings and Recommendations recommending denial of the petition. The district court adopted the 2002 F&Rs and denied the writ. Petitioner appealed the judgment to this Court, before a panel consisting of Thomas G. Nelson, William A. Fletcher, and Marsha S. Berzon, Circuit Judges. In this Court's published decision, Randolph v. California, 380 F.3d 1133 (9th Cir. 2004), the panel affirmed as to some claims, and remanded for further fact-finding as to petitioner's Massiah[2] and Brady[3] claims. It is respectfully suggested that this case be assigned to this same panel of judges, since the current decision addresses questions raised in the panel's prior decision.

This Court, reversing the district court's contrary finding, concluded that Moore "was acting as an agent of the State when he was placed in Randolph's cell after meeting with Deputy District Attorney Oppliger and Detective Chavez,

[1] Presumably, the district court was unaware that this case is a pre-AEDPA case.

[2] Massiah v. United States, 377 U.S. 201 (1964) ("[W]henever an agent of the Government deliberately elicits incriminating statements from an indicted defendant in the absence of counsel," the Sixth Amendment right to counsel is violated).

[3] Brady v. Maryland, 373 U.S. 83 (1963).

2

even though there was "no express agreement between the informant and the government that the informant will be compensated for his services." Randolph, 380 F.3d at 1144. Whether there was Sixth Amendment/Massiah violation, and whether nondisclosure of Moore's meeting with officials violated Brady depended on the timing of Moore's first meeting with prosecution officials, and whether Moore had elicited statements.

This Court remanded for further fact-finding because it was "unable to determine whether a Massiah violation occurred because two critical factual issues have not been resolved or properly considered by the district court:" (1) when Moore first met with D.A. Oppliger and investigator Chavez; and (2) what actions Moore took that may constitute "deliberate elicitation" under United States v. Henry, 447 U.S. 264, 270-71 (1980).

On remand, the magistrate judge allowed additional discovery and submissions, and then held a second evidentiary hearing, receiving testimony from several experts on jail movements, housing decisions, and jailhouse informant placement. The new evidence included jail records that established the dates jailhouse informant Ronnie Moore was moved out of and then back into Mr. Randolph's cell. These records did not contradict Moore's repeated testimony that he met with state officials the same day he gave his leniency letter to the public defender.

I.     Questions For Which Leave to Appeal is Sought

Petitioner seeks to appeal the denial of the §2254 petition on the following grounds, and therefore seeks a Certificate of Probable Cause on these claims:

1. Whether petitioner established that the prosecution deliberately placed jailhouse informant Ronnie Moore with Mr. Randolph after Moore had become a police agent, and Randolph had been arraigned and appointed counsel, in violation of petitioner's Sixth Amendment right to counsel under Massiah v.

3

EXIBIT (1)   GRound (1)
Newly Evidenca Discovered
Records

Racially Conviction-Due To
Un Constitutional Search And Seizure

San Quentin Prison where he was serving time on an unrelated drug conviction. Previously, sex ... ...

2. Petitioner Willis Randolph, C-50466, is a parolee in the custody of the State of California, who previously, while confined at San Quentin State Prison, was out-to-court.

3. Petitioner Leo Webb, C-5305, is a prisoner in the custody of the State of California and is presently incarcerated at San Quentin state prison.

4. Respondent Daniel Vasquez is Warden of San Quentin State Prison and the legal custodian of petitioners.

5. Respondent James Rowland is Director of the California Department of Corrections and as such is responsible for the administration of its prisons and of the worktime credit program.

## STATEMENT OF THE CASE

... 1989 ... petition for a writ of habeas corpus was filed in the Marin County Superior Court. Following the issuance of an order to show cause, the filing of a return, and the filing of a denial and exception, the court on March 29, 1989 filed an order denying the petition. (In re Willis Randolph and Leo Webb (Super. Ct. Marin County, 1989, No. 141315), Order Denying Petition filed March 29, 1989, attached hereto as Exhibit A.)

IV.

## STATEMENT OF FACTS

A.

### FACTS REGARDING PETITIONER WILLIS RANDOLPH

later, in December 1987, Willis Randolph was arrested in San Quentin Prison, and charged with Lamont's murder. The preliminary hearing took place on February 18 and 19, 1988. The murder case suddenly became the focus of widespread publicity in newspaper articles and television and radio broadcasts throughout rural Fresno County.

Defense counsel moved for change of venue on April 5, 1988, and submitted 37 articles and broadcast scripts. (ER 1-30.) All but four of the articles were published after petitioner's arrest on December 16, 1987. Between that date and the end of the preliminary hearing just over two months later, six articles were published in the Fresno Bee,[9] twenty-four television broadcasts were shown on channels 30, 24 and 47, and seven radio stories concerning the incident were broadcast on KMJ Station 58 alone. The Fresno Bee was the only major

------

[9]The Fresno Bee had the following circulation for the 12 months ending December 1993:  Daily 149,896; Sunday 186,864.

32

AUTHORIZATION AND CERTIFICATE OF CONFIDENTIAL

C-141695

| | 1A. Name of Husband—First Name | 1B. Middle Name | 1C. Last Name |
|---|---|---|---|
| PERSONAL DATA OF HUSBAND | WILLIS | JUNIOR | RANDOLPH |

| | 2. Date of Birth—Month, Day, Year | 3. Age (Last Birthday) | 4. Birthplace (State or Foreign Country) |
|---|---|---|---|
| | 12-27-58 | 27 | CA |

| | 5A. Name of Father of Husband | 5B. Birthplace | 6A. Birth Name of Mother of Husband | 6B. Birthplace |
|---|---|---|---|---|
| | WILLIS RANDOLPH | ARK. | LULA VANGHN | TEX. |

| | 7A. Name of Wife—First Name | 7B. Middle Name | 7C. Last Name (Birth Name) |
|---|---|---|---|
| PERSONAL DATA OF WIFE | CARLA | RUNEE | DOZIER |

| | 8. Date of Birth—Month, Day, Year | 9. Age (Last Birthday) | 10. Birthplace (State or Foreign Country) |
|---|---|---|---|
| | 5-21-62 | 23 | CA |

| | 11A. Name of Father of Wife | 11B. Birthplace | 12A. Birth Name of Mother of Wife | 12B. Birthplace |
|---|---|---|---|---|
| | WALTER DOZIER | OKLA. | WANDA MARGIE METCALF | TEX. |

| | 13A. Residence (Street and Number, Rural Number, or Location) | 13B. City or Town | 13C. County (Outside California, Enter State) |
|---|---|---|---|
| RESIDENCE OF HUSBAND AND WIFE | 834 W. GARLAND | FRESNO | FRESNO |

AFFIDAVIT OF HUSBAND AND WIFE

WE the undersigned, declare or affirm, each for ourselves, that we are an unmarried man and an unmarried woman, not minors, and have been living together as husband and wife and that the personal information provided above is true and correct to the best of our knowledge.

| 14A. Signature of Husband | 14B. Signature of Wife |
|---|---|
| | |

### AUTHORIZATION

The undersigned, empowered by the laws of the State of California, do hereby certify that the above-named parties to be married have personally appeared before me, have declared or affirmed that they meet all the requirements of the law, and the fees prescribed by law having been paid, do hereby authorize said parties to be married pursuant to Section 4213, Civil Code.

| 15A. Authorizing Signature | 16. Name and address if Other Than County Clerk | Affix Seal |
|---|---|---|
| 15B. Title   DEPUTY CLERK | 15C. Issue Date  5-6-86 | ISSUED PURSUANT TO SECTION 420 C.C  42133 |
| FRESNO | 8-4-86 | |

| CERTIFICATION OF PERSON PERFORMING CEREMONY | 17. I hereby certify that the above named man and woman were joined by me in marriage in accordance with the laws of the State of California. |
|---|---|

On _____ Month _____ Day ____ 19 86
At _____ FRESNO California
City or Town    County

| 18A. Signature of Person Performing Ceremony and Official Title |
|---|
| 18B. Name of Person Performing Ceremony (Type)   RUSSELL A KNIGHT | 18C. Denomination |
| 18D. Address—Street Address, City or Town, and State (Type)  1152 N _____ Fresno |

### TO BE COMPLETED BY COUNTY CLERK AT THE TIME OF FILING

| COUNTY CLERK | 19. Date Accepted for Filing  MAY 06 1986 | 20. County Clerk—Signature  GALEN _____ | Deputy |
|---|---|---|---|

SEE REVERSE SIDE FOR FURTHER EXPLANATION AND APPLICABLE CODE SECTIONS

The foregoing instrument is a correct copy of the original on file in this office.

ATTEST:

FEB 0 2 1987

GALEN LARSON, County Clerk
State of California
County of Fresno

By _____
DEPUTY

RANDOLPH, WILLIS, Jr.                     VIOLATED CONDITION    4

IN HOLD BY THE ACT OF: Vehicular burglary (5C)

EVIDENCE CIRCUMSTANCES:

On 9-2-86, Randolph and a second suspect were arrested by the Fresno Police Department on charges of vehicular burglary.

Sgt. G. Hains, Fresno Police Department, F210, at 0602 hours on this day, was dispatched regarding a possible vehicle burglary in progress. Upon arrival, Sgt. Hains observed two black males remove property from a white Pinto parked in the parking lot at 2620 E. Olive and began walking towards the street. One suspect, later identified as Randolph, was observed to be wearing a dark jogging suit with turquoise trim and what appeared to be white gloves with stripes around the wrist area. Sgt. Hains approached the suspects on foot, however, both fled when they observed Sgt. Hains. After pursuit, one suspect was apprehended and Sgt. Hains believed the other (Randolph) had entered one of the apartments at 2620 E. Olive. Sgt. Hains checked apt. 102 and upon entry (permitted by Randolph's wife, found Randolph lying in bed. He observed a band of perspiration on the subject's left temple. A search of the residence, authorized by this Agent, recovered a black jogging suit with turquoise stripes and white athletic socks with maroon stripes which were covered with grease. All the clothing was found in a laundry hamper in the bathroom and appeared to be still damp with perspiration. Sgt. Hains positively identified the clothing as that worn by the second suspect. It should be noted that Randolph also matched the physical description of the second suspect observed by Sgt. Hains. The property recovered, which was valued at $250.

INMATE'S STATEMENT:

Randolph denies any wrong doing and stated that the jogging suit in question was not his property.

PENDING CRIMINAL MATTERS:

Randolph is currently being prosecuted for PC 459 (vehicle), #F107939-1.

WITNESSES:

Sgt. Hains will testify regarding the circumstances of the offense and Randolph's arrest.

| Charges | Date of hold | Date of Discovery | Date Hold Removed | CHC Date or Next Court Date and Case No. |
|---|---|---|---|---|
| | | | | #F107939-1 |
| | 9-2-86 | | | 9-17-86 |

Location including Booking Number, or Address and Telephone Number. If not in Custody.

and County Jail

| | CDC Number | Report Date | Agent Signature and Title |
|---|---|---|---|
| RANDOLPH, Willis, Jr. | C-50066 | 9-15-86 | FRE# 61 |
| | | | 9-16-86 |

(BG SOUND) (...    STEREO    (

MCKINNEY DIDN'T
SURFACE AS A WITNESS
UNTIL 1986...BECOMING
KNOWN THROUGH AN UNRELATED
CASE-

| | |
|---|---|
| SLUG | RANDOLPH-H-PREOIM |
| SHOW | 6 |
| TIME | |
| DATE | 2-18 |
| WRITER | MJH |
| PHOTOGRAPHER | MATT / EARL |

THAT SMELLS
LIKE A FRAME-UP TO
RANDOLPH'S SISTER.

~ UP FULL

STO (TAPE 3 2)

IN 3:14 TO ME WHAT....

TTY HOLMES

OUT 3:23...FRAME MYBROTHER

O EJ (BG SOUND)

STEF/VO

A WOMAN WHO
IDENTIFIED HERSELF AS
RANDOLPH'S WIFE SAYS HE'S
NOT A KILLER....

FULL

SOT :12

IN 7:08 ONLY THING HE.....

^ RANDOLPH

OUT 7:20...DON'T BELIEVE IT

J (BG SOUND)

STEF/VO

PROSECUTOR JIM.
OPPLIGER WON'T SAY WHO HE
BELIEVES HIRED RANDOLPH TO
KILL THE COLLINS BOY.
BUT LAMONT'S
MOTHER TOLD OF
STRUGGLES TO GET CHILD
SUPPORT FROM THE FATHER....

*inter 24*

Exibit    (D) Ground (2)
    Newly discovered Evidence
    Records

Racially Selected Jury
unconstitutionally Selected

should have been acquitted of first degree murder on the basis of "affidavits" he obtained from the jurors after discharge of the jury is without merit.

## IV.   THE MOTION FOR A NEW TRIAL

After the jury found appellant guilty of first degree murder at his second trial, he moved for a new trial on the ground of juror misconduct, and the motion was denied. Appellant contends that this ruling was erroneous. We disagree.

During voir dire, the court asked juror Donald Emery "Do you belong to any clubs or organizations?" Emery responded, "No." After the jury found appellant guilty, appellant obtained a declaration of Emery's co-worker, Richard Neff. The Neff declaration stated that in late 1958 Emery and Emery's boss invited Neff to a L'Amico Club party, that during this party people would tell jokes, and that "[t]hese jokes were of a racist type referring to African-Americans as 'niggers.'" Neff stated that both Emery and Emery's boss were members of L'Amico. He stated that in March or April of 1989 he, Emery and Emery's boss attended a luncheon meeting of L'Amico, and that "[t]he meeting again consisted of the telling of racist jokes where African-Americans were referred to as 'niggers.'" He also stated that on three occasions he heard Emery's boss say to Emery "if he's black, he's guilty." The Neff declaration does not state when or why Neff happened to come into contact with appellant's attorney, what the L'Amico Club is, whether he ever heard juror Emery ever make any remark Neff would consider to be racist, what joke or jokes Neff heard that he considered to be "of a racist type," whether he thought any such joke was funny or not, whether

during his service as a juror." Neff also stated, with regard to the boss's alleged comments, that Neff saw Emery standing in clear view of the boss, but "did not see/hear Mr. Don Emery respond in any way" to the boss's statement.

The boss submitted a declaration saying that he did not recall making the statement "If he's black, he's guilty," and that if he did make such a statement "it would not have been serious." He added that "I consider myself well above average as an employer of minority races" and that "Mr. Emery does not make racial slurs or exhibit bias toward racial or ethnic minorities."

L'Amico member Bill Almeida submitted a declaration stating in part:

> "I belong to a group called L'Amico, an informal social club which meets for lunch on Wednesdays. This group stands for nothing. We are a group of businessmen who get together because we enjoy each others company. It's hard to say if we are really a formal club since there are no rules. I myself am Hispanic. There are Armenians, Jews, Italians, and Blacks in the group. We poke fun at everyone."

Almeida added that "[t]his is not a racist group and if it was, I would not be a part of it." L'Amico member Herb Bauer submitted a declaration stating that "[a] good sense of humor is the main prerequisite for joining this luncheon group." He also stated that "it's a very informal group which I don't even consider a formal club or organization."

Several jurors submitted affidavits stating that at one point in the deliberations the vote was nine-to-three in favor of a murder for hire special circumstance and that Emery was one of the three not in favor of the special circumstance. They also

000028

stated that they never heard Emery make a racial or ethnic slur or a derogatory remark about appellant.

In People v. Diaz (1984) 152 Cal.App.3d 926, the Fourth District held that a juror's concealment, during voir dire examination, of a state of mind which would prevent a person from acting impartially is misconduct, whether that concealment is intentional or not, and that the concealment creates a presumption of prejudice. (Id. at p. 934.) Subsequently, the Second District in People v. Jackson (1985) 168 Cal.App.3d 700, and this court in People v. Kelly (1986) 185 Cal.App.3d 118 did not view unintentional concealment so harshly.

> ". . . we conclude that the proper test to be applied to unintentional 'concealment' is whether the juror is sufficiently biased to constitute good cause for the court to find under Penal Code sections 1089 and 1123 that he is unable to perform his duty." (People v. Jackson, supra, 168 Cal.app.3d at p. 706; People v. Kelly, supra, 185 Cal.App.3d at p. 127.)

The trial judge found that even if the Diaz rule, more favorable to appellant, were to apply, any presumption of prejudice was rebutted by respondent's showing that Emery was not biased against appellant.

> " . . . so when we have a mature, intelligent man like Mr. Emery -- and he certainly impressed me through his attention throughout the trial he was both mature and intelligent -- I certainly find that no evidence of any concealment of any bias or attitude that would be adverse to black persons.
>
> "The finding is inadvertent failure to mention the L'Amico Club. And the Court concludes that any presumption of prejudice has been rebutted and that all things considered that the defendant has not been prevented from having a fair trial by Juror Don Emery being a member of the jury."

Additional Information For The Court
I Never Was Aware Of How My Appeal Attorney
Done me until 2014, When The Innocent project In Santa
Clara Sent my Breifs And Transcripts, Back to me,
To CMF Vacaville, Whom Attorney John Cotten Had
Contacted About my Innocents, And They Look And Read
Transcripts, Briefs, And Sent Them Back In 2014, And Said Your
DNA was Destroyed, So you Are gonna Have to Bring This
up In The Federal Court, 12 Boxes of legal work was Sent To
CMF-2014, And All These Attorneys on Appeal knew my Education
was Slow. Starting From Direct Appeal Attorney Karen Hart,
Look At The issue She Raised, And When I was In The Federal
All my Transcripts And Briefs Were In Federal Defenders Hands
until 2014 I was given them At CMF Vacaville From Santa Clara
Innocent project who Review your DNA was Detroyed By The
State public Defender And District Attorney And Superior Court, When
I was In The Federal Courts, I didn't know Anything About The Appeals on
what These Attorneys Have Done To me, But When Senate Bill 1058 And
Penal Code 1473-(A) (D) I Said I Have To Start Back To The Superior
Court, Exhaust, my Remedies, Back To The Federal Courts To
Show Them With These issues That Never was Raised By my
Attorney on Direct Appeal knew This was A Wrongful
Conviction, Letter From John Cotten Federal Attorney Who
Said You Were A Victum of The Conviction Case, News papers
In Transcripts with public Defender Robert Rainwater-District
Attorney Jim obbligger Saying An Innocent Man Will get out one Day,
A Constitution Violation Has Occured In The State Court
of A Innocent Man, Whom Have Served A Life Sentence
Wrongfully When District Attorney Theory was The Father, Hired
Someone To kill His son, He Never was Arrested Are Convicted And
They Wrongfully Charge me And convicted me.

BOARD OF PAROLE HEARING                                          STATE OF CALIFORNIA
LIFE PRISONER HEARING –
EXTRAORDINARY ACTION AND DECISION

*FOR BOARD USE ONLY*

# DECISION / ORDER

## GIVE UP RIGHT TO ATTEND THE HEARING

[ ] Granted – YES, the hearing will be held without prisoner.
[ ] Denied – NO

## CHOOSE TO WAIVE HEARING

[ ] Granted – YES, the waiver is approved for the time requested.
[ ] Denied – NO:
    [ ] The request is on time, but it is not a reasonable request
    [ ] The reason for the request should have been known 45 days before the hearing
    [ ] The request is late, and the reason for the request is not good enough

Reasons/Comments: _____

_____

## NOT SUITABLE FOR PAROLE (Stipulation)

[✓] Granted – YES, there is a good reason to not hold the hearing for the time requested.
[ ] Denied – NO, the request is not reasonable

Reasons/Comments: _Inmate needs additional time to create distance
with (2) 115s, attain additional self-help programming and
a decision from the Innocence Project._

## POSTPONE HEARING

[ ] Granted – YES, there is a good reason to postpone.  Postpone for _____ [*months/years*].
[ ] Denied – NO:
    [ ] Prisoner did not make his or her best effort to get the information, or information not essential
    [ ] Prisoner should have made the request sooner

Reasons/Comments: _____

_____

Approval by BPH Official(s):

| Signed: | | Title: Commissioner | Date: 8/27/13 |
| Signed: | | Title: Deputy Commissioner | Date: 8/27/13 |

| NAME | CDC# | PRISON | CALENDAR | DATE |
| RANDOLPH, WILLIS | E47241 | CSP-SOL | | |

BOARD OF PAROLE HEARINGS
LIFE PRISONER HEARING DECISION FACE SHEET

STATE OF CALIFORNIA

☐ PAROLE GRANTED - (YES)
  CDC: Do not release prisoner before Governor's review

☐ PAROLE DENIED - (NO)        YEAR(S)

☒ INMATE SIGNED STIPULATION OF UNSUITABILITY FOR:

☐ INMATE SIGNED VOLUNTARY WAIVER FOR        YEAR(S)

☐ SPLIT DECISION

☐ CONTINUE        MONTH(S)

Reason:

☐ HEARING POSTPONED

Reason:

**Records Use Only**
Parole Release Date _____
                     YR    MO    DAY
Attach Prison Calculation Sheet

3 YEAR(S)

Length:

---

### PANEL RECOMMENDATIONS AND REQUESTS

The Board Recommends:          As Available

☒ No more 115's or 128A's      ☒ Get self-help

☐ Work to reduce custody level  ☐ Learn a trade

☒ Stay discipline free          ☒ Get therapy

☒ Earn positive chronos         ☐ Get a GED

☐ Recommend transfer to

☒ Other  Cooperate with clinician on the psych evaluation prior to the next hearing.

---

Penal Code 3042 Notice        ☐ Sent

| Commitment Offense(s) | Code(s) | Crime(s) |
|---|---|---|
| | PC187 | MURDER 1ST |
| | PC459 2ND | BURGLARY 2ND |
| | PC211 | ROBBERY VICTIM INJURED |
| | PC459 2ND | BURGLARY 2ND |

| Date inmate came to CDC | Date Life Term Begin | Minimum Eligible Parole Date |
|---|---|---|
| March 8, 1990 | July 10, 1990 | June 20, 2008 |

☐ Initial Hearing   ☒ Subsequent (Hearing #) 1        ☒ Date of Last Hearing 09/14/2011

CDC Representative

Attorney for Prisoner  MARCIA HURST        Address  17376 N. MEADOWVIEW LANE
                                                    NINE MILE FALLS, WA 99026

D.A. Representative  WORTH VOGEL        County  Fresno

This form and the Board's decision at the hearing is only <u>proposed</u> and NOT FINAL.
It will not become final until it is reviewed.

ANDRES JAMES - Deputy Commissioner        Date  08/27/2013
MONTES MARISELA - Commissioner            Date  08/27/2013

| NAME | CDC | PRISON |
|---|---|---|
| RANDOLPH, WILLIS JR | E47241 | California State Prison, Solano |

BPH 1001        ACTION DATE  08/27/2013        SCHEDULED DATE        08/27/2013

**Case Rounds**

## Ed Easley

On November 19, 1993, Ed Easley pled no contest to two counts of lewd and lascivious conduct for allegedly molesting the 9-year-old daughter of his girlfriend. He did so because his attorney advised him that taking the prosecution's offer of a maximum 10-year sentence with the possibility of probation was probably better than being convicted at trial and facing a possible sentence of nearly 40 years.

Though Mr. Easley knew he was not guilty and that the alleged victim knew it as well, he was reluctant to put her through the ordeal of testifying at trial. He agreed to plead to the deal, hoping to receive probation. When he realized that despite the plea of no contest he would have to admit to criminal conduct, Mr. Easley moved to withdraw the plea, but the court denied his motion.

He was sentenced to 10 years, served five, and was paroled. He was then required to register as a sex offender.

In the meantime, the girl, Nichole, had become a young adult and had recanted her allegations.

She tried to recant to the District Attorney's office when she was 14, but they sent her away, threatening to have her aunt arrested for convincing Nichole to recant to "get her boyfriend back." She also recanted to a therapist, family members, friends, co-workers, and others.

Finally Nichole contacted NCIP saying she had falsely accused Mr. Easley and that she wanted to try to help him clear his name. She explained that she had in fact been molested by her teenage

## Habeas Corpus

Literally in Latin, "you have the body," habeas corpus is a judicial mandate requiring that a prisoner be brought before the court to determine whether the government has the right to continue detaining them. The individual being held or their representative can petition the court for such a writ.

cousin and his friend—and that her mother and her cousin's mother had told her to implicate Mr. Easley so her cousin wouldn't get into trouble.

On June 4, 2007, NCIP filed a petition to have the conviction reversed. Ultimately an evidentiary hearing was ordered in Shasta County Superior Court, where Nichole and others testified. Nichole said unequivocally, "X and Y touched me inappropriately and Mr. Easley did not. That's the truth." Mr. Easley also testified, denying all allegations, and explaining why, despite his innocence, he had pled no contest. Nichole's cousin also testified that Mr. Easley had done nothing wrong, and that he himself had engaged in inappropriate conduct with Nichole. While the judge did not find Nichole untruthful, he did not overturn the conviction. The court of appeal upheld that denial.

NCIP then filed a petition for a writ of habeas corpus challenging the ruling in the California Supreme Court. In July 2010, the Court denied the petition with a single sentence, saying Mr. Easley had no standing to challenge his conviction. Because he was on parole for failing to register as a sex offender and not because of the underlying sex offense, he was deemed to not be "in custody" when he filed the petition and, therefore, lacked standing. Apparently his innocence is immaterial.

Having exhausted all legal remedies, Mr. Easley remains convicted of a crime which the victim has for years said he didn't commit. This is a devastating blow for Easley and to the cause of justice. He is forced to live with the enormous

restraint on his liberty imposed by the sex offender requirements, as well as the ever-present threat that even a technical violation could land him in prison with a life sentence.

And because the California courts have, we believe incorrectly, interpreted the state statute for the writ of habeas corpus to require custody to challenge even a wrongful conviction, the only possibility is to amend the law to clarify that an innocent defendant in Mr. Easley's position can pursue an action to have his conviction reversed. ❖

## Willis Randolph

On June 24, 1981, a 10-year-old boy was murdered. Seven years later, Willis Randolph was charged with the murder. Although the prosecution theorized that the victim's father (who had made threats to the victim's mother) hired Randolph to kill his son so that he would no longer have to pay child support, the victim's father was never charged.

No evidence linked Randolph to the father or even suggested that the two knew each other.

The first jury deadlocked but the second convicted Randolph on December

8, 1989. Randolph was sentenced to 27 years to life.

The difference between the two trials was the testimony of jailhouse informants.

One informant, Ronald Moore, who was facing charges for possessing multiple stolen cars and a probation violation, claimed that Randolph had confessed the murder to him. The other, Jack Konkle, claimed that Randolph had said he would not serve time even if convicted because he would "get off" by testifying against the victim's father. In return for their testimony, Konkle served no time and Moore served a year in county jail with no prison time. Konkle has since admitted under oath that he lied to get out of jail, and Moore has signed a declaration and testified under oath that he fabricated his trial testimony.

Randolph became a suspect five years after the murder when Randall McKinney, who was being interrogated regarding another homicide, claimed that he had seen Randolph near where the boy's body was found. When asked at Randolph's trial why he had not come forward sooner, McKinney claimed that he had told his mother and relied on her to "take care of it." The remaining evidence consisted of witnesses who reported seeing a car similar to Randolph's near the murder scene.

However, none described the stickers, the hydraulically-operated raised rear end, or the unusual antenna that made Randolph's car distinct. Further, the tire tracks did not match. Finally, expert testimony eliminated any suggestion that the victim was transported in Randolph's trunk because the solenoid batteries used to operate the hydraulic lifter would have left a residue. Testing failed to identify any of the residue on the victim's clothing or body.

Before the second trial, the defense moved to exclude the jailhouse informants' testimony as so unreliable that it violated due process. After the hearing, the court expressed serious doubt about the informants' credibility and said that he was the trier of fact (the jury in this case), he would disregard the main informant's testimony completely.

Suzanne Luban, a superb private attorney, has been fighting on Mr. Randolph's behalf since 1993 in the California Supreme Court, the federal district court, and the Ninth Circuit Court of Appeal. Ultimately all of the courts have turned aside his claim.

Mr. Randolph, who has now been in prison for more than 10 years, is now considering petitioning the U.S. Supreme Court to hear the lower court's decision. NCIP hopes that justice will be done for Mr. Randolph. ❖

*See related article on the costs of wrongful conviction on page 19. Mr. Randolph's imprisonment has cost California taxpayers nearly half a million dollars in prison costs alone, not including the cost of trials and appeals.*

# What Constitutes Standing for Writ of Habeas Corpus Claims?

California Penal Code section 1473(a) states: "Every person unlawfully imprisoned or restrained of his liberty, under any pretense whatever, may prosecute a writ of habeas corpus, to inquire into the cause of such imprisonment or restraint." If a person is imprisoned or in constructive custody of the government (for example, on parole, probation, or released from custody on bail), he or she is eligible to file a petition for the writ of habeas corpus with the court. The court then has the power to grant relief for the petitioner. When a person has finished serving his sentence, either in prison or on parole, he is no longer eligible for relief under a habeas corpus petition.

NCIP has argued that Mr. Easley is in the constructive custody of the state because his freedom is restrained in being required to register as a sex offender, and the court is incorrectly interpreting the statute in holding that he does not have standing to petition for relief based on his evidence of innocence. There is case law in support of this argument. As it stands, regardless of the facts, Mr. Easley must register as a sex offender for a crime he did not commit. If a parolee can file a petition for writ of habeas corpus, a person wrongly convicted and required to register as a sex offender should be able to file a habeas corpus petition as well.

(4) Among other topics, Deputy Chavez testified as to hearsay statements attributed to Raymond Lewis (who denied making the statements in part), which were damaging to petitioner;

(5) Counsel represented Deputy Chavez in a civil case against the County of Fresno, alleging discrimination in promotion, Linda Lee, Pete Chavez, Joe Roscon v. Fresno County, Civil Case No. 409768. The complaint was filed on November 14, 1989, and the trial commenced June 11, 1991. Chavez testified in the trial;

(6) Counsel did not disclose her representation of Deputy Chavez to petitioner, C-CAP, or anyone else, and petitioner did not waive the conflict;

(7) Counsel actively represented conflicted interests, which adversely affected the adequacy of the representation.

(b) Supporting Authorities: The argument and authorities cited in support of the previous claim (IAC Trial Counsel) are incorporated herein by reference. Ms. Hart's representation of Pete Chavez was an actual conflict of interest which interfered with and impaired her representation of petitioner, and thereby

# An 8-year-old murder case ends in mistrial

**By ALEX PULASKI**
Bee staff writer

A murder case that took eight years to reach court ended in mistrial Tuesday because jurors could not agree on a verdict.

The jurors said they were leaning, 8-4 toward convicting Willis Randolph. He was charged with fatally shooting Lamont Collins of Madera in 1981.

At 2:15 p.m. Tuesday, woman Judy Kochheiser of Fresno told Superior Judge Gene Gomes that the jurors had no hope of reaching a unanimous verdict.

Although Randolph was charged with first-degree murder and could have been sentenced to death.



Kochheiser said afterward that the jurors who believed Randolph to be guilty thought the verdict should have been in the second degree.

One juror, Maude Neffert, said the case was too circumstantial and could not support any sort of conviction. Neffert cited differences in prosecution testimony about the color of a car, as reasons she voted for acquittal.

Though the case ended in disagreement over guilt, the jurors were apparently not of one mind regarding a possible motive.

The prosecution's case was that Lamont Collins' father, Donald Collins of Fresno, had...

See Mistrial, Page B5

---

# Mistrial

Continued from Metro page

the boy. The reason prosecutor Jim Oppliger said in his closing argument was that a dispute over child support payments for the boy was causing problems in Donald Collins' current marriage.

Donald Collins testified during the trial that he had never met Randolph and had never conspired to have his son murdered.

The jurors questioned that.

"We thought that the wrong person was on trial," said juror Laura Mills of Fresno.

Oppliger said there was not enough

...evidence to charge Collins with a ...

He said his office would probably retry Randolph, but that the decision would not be made for several...

Donald Collins said by telephone following the verdict that he was disappointed that the jury was unable to reach a decision. Now, he said, the allegation that he hired his son's killer remains hanging over his head.

A hung jury in a death-penalty case is usually considered a victory for the defense, but Randolph's attorney, Robert Rainwater, said he was not satisfied. He said there were enough holes in the prosecu-

...house to support an acquittal.

Most of those holes stemmed from the passage of time between the occurrence of the crime and the trial. The reason for the lapse was that the prosecution's key witness — a man who placed Randolph at the crime scene — did not contact investigators until 1986.

Randolph's sister, Betty Holmes of Fresno, said that though she had hoped for an acquittal, a hung jury was a partial answer to her prayers.

"The truth is coming out and it's showing that my brother's innocent," she said. "They didn't have any facts — just hearsay... we've been fasting and praying that the jury would see the truth."

EXiBit ('3')  ReCintly  newly Evidence

Ground

Conviction Obtained To unlawFul ARRest

FalseLy Convicted

Case 1:15-cv-00595-AWI-EPG Document 60-9 Filed 04/22/16 Page 54 of 68

Fresno Bee/John Walker

# Close call

Roxie Moradian, 76, of Fresno was driving in the underground garage of the Fresno Hilton Hotel Tuesday when she lost control of her car and ran into a wall, according to Fresno police. She was not injured. Officer Rodney Ramos, right, fills out a report.

# Witness recants statement on Randolph

By ALEX PULASKI
Bee staff writer

A prosecution witness in Willis Randolph Jr.'s murder trial recanted earlier damaging statements against Randolph on Tuesday, saying he had lied to investigators under duress.

The witness, Raymond Anthony Lewis, said prosecutor Jim Oppliger and investigators had tried to force him to testify against Randolph. Out of court, Oppliger denied doing so.

Randolph, 29, is on trial in Fresno County Superior Court for the 1981 murder of Lamont Collins, 10, of Madera. Lamont was shot, and his body was dumped three miles northeast of Riverdale.

The prosecution's theory of the case is that the boy's father hired Randolph to execute Lamont in an attempt to avoid making child-support payments. The father, however, has not been charged with any crime and says he is innocent.

According to Fresno County Sheriff's Department reports, Lewis told deputies in September 1986 that Randolph had implicated himself in Lamont's death. Lewis told deputies that the two had been drinking in a Fresno bar when Randolph allegedly said, "I was paid to kill somebody a long time ago."

But on the witness stand Tuesday in Judge Gene Gomes' courtroom, Lewis said Randolph had never said any such thing.

Lewis then inclined his head toward Pete Chavez, the investigator on the case for the Sheriff's Department, who sits next to prosecutor Oppliger in the courtroom.

"That man, right there, told me that," Lewis said.

Lewis said Chavez had made up the story of Randolph's confession and had coerced Lewis into agreeing by threatening him. At the time, Lewis was in custody and facing felony charges.

He testified that Chavez told him it would go hard on him if he did not cooperate with investigators. Later, according to Lewis, Oppliger offered him leniency in another case if he would testify against Randolph.

Lewis has been charged in a separate murder case. He testified that Oppliger offered a guarantee that he would not face the death penalty if he cooperated.

"All you want me to do is lie, man," Lewis told Oppliger under questioning in court. "I ain't going to lie, no matter what kind of deal you give me."

Outside court, Oppliger said the only offer he had made to Lewis was that if Lewis' attorney wanted, Oppliger would testify during the death-penalty phase of Lewis' trial that he had cooperated in another case.

Chavez also took the stand to testify that he had not invented Lewis' statement implicating Randolph.

# Property owners lose court fight with city

BY BETSY CLEMINGS
Bee staff writer

Two property owners claim

The judge disagreed, and his ruling elicited surprise from the Blossers and their attorney, Joseph Gughemetti.

Gughemetti said the Blossers then and now

# Shoe leads to arrest in two hit-run deaths

By LOUIS GALVAN
Bee staff writer

A shoe found inside a car involved in a fatal hit-and-run

on with a motorcycle, killing two people riding the motorcycle.

The accident occurred night of

spoken with Randall McKinney either just before or after the preliminary hearing in the case. (RT 1382) McKinney told Furtado "That mother fucker's ass is mine. I want to get him." [referring to appellant] (RT 1383) Furtado felt that McKinney hated Willis/Randolph. (RT 1383) Kerry Bonner, who had known Randall McKinney in grammar school and high school, said that McKinney had told him about getting into trouble with the law and getting arrested about two and one-half years before the trial. (Reporter's Transcript, November 28, pages 24, 25) McKinney told Bonner he had been arrested for possession of cocaine found in the bedroom of his dresser drawer (Reporter's Transcript, November 28, page 25).

Homer Dunn, a ~~[illegible]~~ and uncle of Ronnie Heart, one of the ~~[illegible]~~ defendants in the prosecution's case, denied having a pond on his property but did say he had an irrigation ditch which had been dry for the last few years. (RT 1113-1117) He and appellant had gone to the pond to obtain some fish during the summer of 1981. (RT 1136) Criminalist Allen Boudreau compared fibers taken from the toe of the left shoe of Lamont Collins and fibers from the sock and pants of Lamont Collins with fibers taken from carpeting recovered from the suspect vehicle. (RT 1121-1125) The fibers from the carpeting in the vehicle were different from any fibers found on Lamont Collins. (RT 1125)

Don Brown, an investigator with the Fresno County Public Defender's office, obtained tires from the suspect vehicle on October 25, 1989. (RT 1139-1140) He removed one tire from

14

79-81.)

Similarly, Jack Konkle testified at his deposition and at the evidentiary hearing that he fabricated virtually all of his testimony about Randolph, including his friendship with Randolph, and each of the incriminating statements Konkle attributed to him.[23] (EHT-3 54-59; ER 479[p.41-44], 482[p.56], 486[p.70-71], 489[p.84], 491[p.90], 495[p.108].) Instead of being friends with Randolph as Konkle testified, he was hostile to petitioner because he was black and talked too much. (ER 490-491[p.88-90].) Konkle would never have exercised with a black man for fear of repercussions as well as for his own racist reasons (ER 480[p.46-47]; EHT-2 41-42), and never even had a direct conversation with Randolph. (EHT-2 45, 46-48.) He told his lawyer he was motivated to testify against Randolph because "he's just a dumb nigger." (ER 556.)

This information was not available to the trial judge, who found that cross-examination would suffice to satisfy due process, despite his impression that both men were primarily unreliable. (TRT 624-637, 715-716.)

At the first trial in which no jailhouse informants testified, the jury was

_____

[23]At trial, Jack Konkle testified that he was friendly with petitioner, that petitioner told him that he was not worried about his case and was not going to do time even if he was convicted, because he would "get off" by testifying against the victim's father. (Trial RT 966, 977-978).

70

Moore was charged with additional offenses of auto burglary. The prosecutor advised Moore not to plead guilty to the charge offenses, and ultimately arranged the dismissal of those charges. Also prior to Moore's trial testimony, he was apprehended in a separate incident of attempted auto burglary. The apprehending officer contacted prosecutor Oppliger, and was told by him to take Moore home, which he did. No criminal charges were filed against Ronnie Moore as a result of this incident;

8. The prosecution deliberately concealed from petitioner and the trial court that Moore had received the benefits detailed in ¶7 immediately above, and instead falsely represented that the only benefits Moore had received or stood to receive in exchange for his testimony were as set forth in his written plea agreement.

9. Had the withheld information set forth in paragraphs 1-8 immediately above been disclosed to the court and the defense, there is a reasonable probability that the result of the trial would have been different. See United States v. Bagley, 473 U.S. 667, 682 (1985). Specifically:

(a) Disclosure of any and all of the above-stated concealed facts would have given defense counsel powerful impeachment material to show motive and bias of informants Konkle, Moore, and Goods, and of Det. Chavez (who testified at trial as to a statement purportedly made by witness Raymond Lewis -- that petitioner had admitted to Lewis in a bar that he had killed someone a long time ago -- which Lewis retracted at trial).

Case: 08-16275    03/11/2010    Page: 8 of 75    ID: 7262133    DktEntry: 42-1

While he waited for the police to arrive, Wieland saw blood still dripping from the body.

On the morning of the murder, Lamont's mother, Marjanna Lee, received a call from the boy's father, Donnie Collins, who asked if she knew where Lamont was. When she said he was outside, Collins replied, "Are you sure?" Collins also wanted to discuss his child support payments. Because she was sleeping, she told him to call back. Ms. Lee never saw her son alive after that morning.

At 3 p.m., Ms. Lee realized that she could not find Lamont. She learned about Lamont's death from the 11:00 p.m. news when she saw a body on a stretcher and had a "gut feeling" it was her son.

The cause of death was shock due to hemorrhaging from gunshot wounds to the chest and head. A hand wound indicated Lamont had touched the gun, possibly grabbing the end of it. One bullet was recovered and it appeared to be a nine millimeter. Death occurred about 12 hours or less before the autopsy. The pathologist also concluded that Lamont ate about 30 minutes to one hour before his death.

Subsequent investigation revealed that a number of people had seen a speeding car on June 24 in the general area where the body was found. Between 3:30 and 4:00 p.m., Anna Nielsen saw a full size dusty blue car

4

On June 24, 1981, about 3:45 p.m., Kenneth Nicholas, a deputy sheriff, saw a General Motors-type mid-size, medium blue car spin off the road and get back on. He thought the driver was a Caucasian or light-skinned Hispanic man.

A set of tire tracks was found near the body and acceleration tracks were found on the nearby asphalt. The tracks were photographed and measured. A section of asphalt, 38 by 13 inches, was removed from the highway. No exact design was discernible on the asphalt.

That same afternoon, between 3:00 and 4:00 p.m. Randall McKinney, who had known appellant since kindergarten, saw appellant standing behind his car near a bridge at Murphy's Slough on Highway 41. Appellant's attention was focused on something in the trunk. McKinney could only see something white in there. According to McKinney, the car was a turquoise '60's model Bonneville with an Afro sticker on top and Mexico sticker on the bottom and a hydraulic system. McKinney said appellant turned around and faced him. That evening, McKinney told his mother what he had seen and thought she was going to report it. However, it was not until May 7, 1986, that he told an officer what he had seen. On that date, he was interviewed by Detective Chavez about another homicide and mentioned what he had seen on June 24, 1981.

Manuel Brown and Robert Harlan both said McKinney told them on June 24, 1981, that he saw defendant at the same point where a young boy's body was found that day.

On May 15, 1986, appellant's car was located at Robert Riggleman's house and seized. Riggleman said appellant sold him

men were primarily unreliable. (TRT 624-637, 715-716.)

At the first trial, in which no jailhouse informants testified, the jury was unable to reach a verdict. The second trial was dominated by the fabricated testimony of jailhouse informants Konkle and Moore. The statements falsely attributed to Randolph by Moore were devastating to the defense, and Konkle's testimony corroborated Moore's claim that Randolph knew the victim's father. Their testimony was the only evidence to link Randolph to the victim's father. The magistrate judge's finding that the admission of Moore's and Konkle's testimony did not render petitioner's trial fundamentally unfair is contradicted by the evidence summarized in the sections above.

Even without regard to the recantations of both Moore and Konkle, the testimony of these two informants was so lacking in credibility that its admission was a violation of due process. Had the trial judge known the facts addressed above, combined with the facts alleged in the Third Amended Petition as to Claim 9, which were adduced at the §352 hearing on November 17, 1989, Moore's and Konkle's testimony would have been excluded on due process grounds.

## V.   THE PROSECUTION CONCEALED EXCULPATORY MATERIAL ABOUT MOORE AND KONKLE

### 1.   Nondisclosure of Massiah Violation

The first part of Claim 10 alleges that the prosecution failed to disclose the

66



Fresno Bee/John Walker

In witness stand, Donald Collins testified that he did not know the accused killer of his 10-year-old son, Lamont.

# Collins disavows role in son's death

Fresno Bee/John Walker

the witness stand, Donald Collins testified that he did not know the accused killer of his 10-year-old son, Lamont.

# Collins disavows role in son's death

By ALEX PULASKI
Staff writer

The father of murder victim Lamont Collins, took the witness stand Wednesday to deny that he had a role in the boy's killing.

Donald Collins, a claims manager at a Fresno insurance office, also testified that one of his reasons for coming to court was his concern that the defendant would implicate him if he did not testify.

Collins took the stand during the first full day of defense testimony in the trial of Willis Randolph Jr., 30. Randolph is accused of killing Lamont Collins in June 1981.

If convicted, Randolph could be sentenced to death. He is being tried in Fresno County Superior Court before a jury and Judge Gene Gomes.

Although Donald Collins is not charged with a crime, the prosecution's case against Randolph is based on the premise that Donald Collins hired him to kill Lamont. One reason, according to court documents, is that Donald Collins wanted to avoid paying $60 monthly child-support payments for Lamont.

The boy was shot four times. His body was dumped along Highway 41, three miles northeast of Riverdale.

In a series of questions from defense attorney Robert Rainwater, Donald Collins denied a number of statements by the boy's mother, Marjana



Willis Randolph is being tried for murder.

Lee of Madera, implicating him in Lamont's death.

Lee had stated that Donald Collins had called her on the day the boy disappeared to ask where he was. Lee also has said that Donald Collins had

threatened the boy's life and said that he had friends who owed him favors.

Collins testified that he had never threatened his son's life.

He denied knowing Randolph.

He said he had never made an agreement with Randolph to kill the boy.

He said he had no reason to have Lamont killed.

Collins did admit, however, being friends with Randolph's uncle. But he said he had never talked with his friend about Randolph.

He said he could not remember whether he had called Lee on the day Lamont was killed. He worked that day, and the telephone company has no record of a call from his home or business to Lee's phone.

Prosecutor Jim Oppliger, who has said that there is insufficient evidence to make a case against Donald Collins, questioned Collins only briefly. After a perfunctory question, Oppliger said he wanted to know why Collins had agreed to testify for the defense.

Was it because Collins was afraid that Randolph would be convicted? And if convicted, that Randolph would give information to the prosecution that could be used against Collins?

"I am concerned about the consequences, yes," Collins said. "I am concerned about what your office will do based upon information that might come from the defendant."

accused. The report shows his wife has been repaid $3,500.

Of his $332,254 campaign spending total, $220,895 came during the latest reporting period that ended June 30.

The largest single expenditure in Capozzi's campaign was the $50,000 paid to Production Complex, Inc., of San Francisco for literature, mainly his "Blueprint Fresno."

Capozzi's campaign consultant, Clinton Reilly Campaigns, of San Francisco, was paid $0 in the latest reporting period.

Humphrey spent $291,024 in her campaign, including $85,787 in the latest reporting period, but ended with a deficit of more than $11,000. A campaign spokesperson for Humphrey said Wednesday the mayor is expected to hold fund-raisers to make up that amount.

Humphrey's campaign also was helped by a $10,000 loan from her husband, television anchor Ken Clarke, made to the campaign.

Humphrey's largest single expenditure in the latest reporting period — $15,178 — went to Townsend and Co. of Sacramento, political consultant. And $5,000 paid to Leo Gallegos of Clovis for his travel and work as a consultant.

None of the other six candidates on the ballot, except Internal Revenue Service tax examiner Lorenzo Garza, reported receiving a substantial amount of money.

Garza's report shows he raised $2,628 in his campaign, including $1,886 from voters. He spent $2,584.

Fresno City Councilman

See Campaign,

# Latest ruling puts new burden on Fresno amnesty group

By DENISE A. RIOS
Bee staff writer

Dozens of undocumented immigrants were afraid to apply for needed public benefits.

When the Immigration and Naturalization Service opened up the amnesty period, it said people who received welfare wouldn't be eligible.

Many people who had received welfare but would have otherwise

Judge Edward Garcia ordered the INS to accept applications from those undocumented immigrants and to review applications that were rejected because the immigrants received public assistance.

cations said the numbers were "significant."

The Western Regional office of the INS hasn't decided what action it will take, said Elizabeth Hacker, assistant regional counsel.

"At this point in time we received a federal order in that case and

recommendation to our Washington, D.C., office concerning an appeal in this case."

The decision is especially significant for undocumented migrants who most ones who received children, sign

cies

egal

ces

ality
stioned

resno-Merced
ces is to fight
s beset by a
llords, welfare
and business
acy is drawing
ormer allies
some agencies
women. His-
citizens raise
quantity and
rs work

ne at the very
Feldman and
member of his
k of a retuned
face

um has turned
an aggressive
a law office
of one lawyer
be identified
names

Wagoner has
services board
s, seeing sev-
l Services be-
ldman, a for-
versity law
oard majority
policies, and
the bill when

fing staff law-
ers predicted
to infuse new
water hitting

oked at legal
and this was a
s

is no longer

voices
a social ser-
o, is harshly

Luisa Medina
her agency's
Services has
er clients de-
ange of infor-
f her staff are
a harder time
getting them a
is like pull-
entro La Fam-
with a private

rjaree Mason
s coordinator
Feldman's ad-
li on housing

# Memories of Lamont



Freeno Bee Bob Durell

Mildred McCrady talks about her slain grandson, whose picture is in foreground.

# Painful questions revived by arrest

By ALEX PULASKI
Bee staff writer

MADERA — Waiting is some-
thing that Lamont Collins' mother
and grandmother are used to.

For six years they waited for
authorities to arrest and charge
someone for killing Lamont. Now
they wait and hope for explana-
tions of why that man, Willis Ran-
dolph Jr., if he is guilty, shot La-
mont in June 1981.

And they wait and wonder
whether Lamont's father, as in-
vestigators suspect, hired Ran-
dolph to execute the boy in June
1981.

The father, Donald Collins of
Fresno, has denied any involve-
ment with the boy's death. He has
not been charged with any crime.
He says he does not know Willis
Randolph Jr. He took and passed
a lie-detector test in an attempt to
prove his innocence.

These days — a month after
Randolph was arrested and a
month before his preliminary
hearing is scheduled in Fresno
Municipal Court — Lamont's
mother, Marjana Lee, and grand-
mother, Mildred McCrady, have
had cause to reopen and examine

See **Painful**, back page

MARJANA LEE
— Lamont's mother

Freeno Bee

000007

Vic
dea
Ga

■ PLO leaders d
government in

Bee news servic

JERUSALEM
shot and killed
tester Saturday a
the occupied Gaz
general strike ord
group

The army said
five other protes
said 19 demonstr
or wounded dur
protests in the G
one woman was

Islamic fund
called for a gen
port the 1,000
held in Israeli mil

Leaflets distrib
Jihad undergr
called on reside
with four sons
camps," and said
continue until "v
warned that those
go to work wou
burned and their

Witnesses said
traffic on roads
workers and
home But thous
tors took to the s
Khan Yunis and
several refugee

# Well
and

By MALCOLM G
Washington Post

Teflon and n
ucts that began
tion that touche
women's legs to
50 this year

Both emerged

759.)

Forensic tests eliminated any suggestion that the victim was transported in the trunk of petitioner's car, which contained solenoid batteries that leaked salts, no traces of which were found on the victim. (TRT 393, 1162-1164, 1171-1173.) No physical evidence linked petitioner or his car to the crime. (TRT 1124-1125, 1129, 1164, 1165.)

Informant Moore later recanted this testimony. In his 1997 declaration, at his 1999 deposition and the 2000 evidentiary hearing, Moore testified that he fabricated his trial testimony about Randolph admitting to committing the murder. (ER 324-325,356-357,362-363,383.

### B.    Evidence Forthcoming in the Habeas Corpus Proceedings

#### 1.    Evidence of Location of First Meeting Between Moore and State Officials, and the Timing of Moore's Becoming an Informant

The matter of the location of the first meeting between Moore and state officials in and of itself may compel a finding of the truth of Willis Randolph's position and of the error by the district court and of the court of appeals.

In fact, there were two meetings in the courthouse, the first on August 17 and the second on August 24, 1989. The first meeting occurred in an empty courtroom (and not in a jury room, which is where the second meeting took place).

13

EXIBIT (4) Ground- Newly Evidence discovered
Records

Conviction obtained, Due To unconstitutional
Failure prosecution disclose DNA
Evidence Destroyed

On April 25, 1988, appellant filed a motion to produce physical evidence for inspection and testing. (CT 1586-1591.)

On April 26, 1988, the court granted the motion to dismiss as to both special circumstance allegations and denied it as to the charge of murder. (CT 1547.)

On April 28, 1988, a first amended information was filed with the same charges of murder and personal use of a firearm and in addition, three prior convictions within the meaning of section 667, subdivision (a), and 1192.7 and two prior convictions within the meaning of section 667.5, subdivision (b). (CT 1597, 1609-1611.)

On April 28, 1988, after an in camera hearing, the court ordered the People to produce some of the evidence requested and ordered the defense not to destroy the samples. (CT 1593.)

On April 29, 1988, in response to a petition filed by the People, the Court of Appeal, Fifth Appellate District, stayed appellant's trial. (CT 1605.)

On May 3, 1988, in response to appellant's request for the victim's blood and hair samples, the People reported that evidence had been inadvertently destroyed when some refrigeration equipment failed. The People were ordered to complete their testing but not to perform any tests that would destroy the samples until appellant had an opportunity to test the evidence. (CT 1607-1608.)

On May 10, 1988, the Court of Appeal denied the People's petition, vacated the order staying the trial, and suggested the People file a petition with the Supreme Court. (CT 1616.)

On June 13, 1988, the trial was stayed upon order of the Supreme Court. (CT 1615.)

The Supreme Court transferred the People's petition back to the Court of Appeal for reconsideration of the kidnapping-murder special circumstance in light of *People v. Morris, In re Morris on Habeas Corpus* (1988) 46 Cal.3d 1. (CT 1612.)

On December 16, 1988, the Court of Appeal directed the Superior Court to vacate the order dismissing the two special circumstances and reinstate the same. (CT 1628-1639.)

On December 29, 1988, appellant's petition for rehearing was denied. (CT 1640.)

On June 9, 1989, appellant filed a motion to challenge the jury composition. (CT 1695-1709.)

as an offer to testify against Randolph.

Moore met with Deputy District Attorney James Oppliger and Detective Pete Chavez, which led to his eventual testimony against Randolph and a plea deal resulting in his immediate release and avoidance of a prison term. At some point, Moore told D.D.A. Oppliger and Chavez that Randolph had admitted to killing Lamont and had said that he was due to receive a lot of money. Moore also told the prosecution team that Randolph had known Lamont's father and had spoken highly of him. (ER 281-283, 305-306.)

With the benefit of these jailhouse informants, the State obtained a conviction for first degree murder. Randolph was sentenced to a prison term of 27 years to life. *Randolph I*, 380 F.3d at 1138-1139.

The evidence against petitioner Randolph was far from conclusive. Apart from the incriminating statements attributed to Randolph by informant Moore, the only link to the crime was McKinney's belated claim to seeing Randolph at the scene. Although Randolph's car in 1981 was similar to the vehicle described by passing motorists, none of them reported seeing the many distinctive markers that Randolph's car had, such as custom aluminum hubcaps, black rims, hydraulic lifters, stickers, and an unusual antenna. (TRT 334, 346-347, 422, 432, 759.) Tire tracks near the victim's body did not match the tires on petitioner's car. (TRT 914,

9

1150-1158.) The descriptions of the driver given by passing motorists were sketchy and varied, including that of an off-duty officer who described the driver as a Caucasian or light-skinned Mexican male. (TRT 759.)

Forensic tests eliminated any suggestion that the victim was transported in the trunk of petitioner's car, which contained solenoid batteries that leaked salts, no traces of which were found on the victim. (TRT 393, 1162-1164, 1171-1173.) No physical evidence linked petitioner or his car to the crime. (TRT 1124-1125, 1129, 1164, 1165.)

B:    The Timing of Moore's Becoming An Informant

The most critical disputed fact is when Moore first met with Oppliger and Chavez – August 17 or August 24, 1989. Moore went to court on August 17, 1989 to either accept the D.A.'s offer of 4.8 years in prison, or set a trial date. (ER 153, 270.) Before court, Moore gave Deputy Public Defender Pete Jones a letter and asked him to give it to the D.A. (ER 270-271,677.) The letter said Moore did not want to keep getting in trouble and end up like his cell-mate Willis Randolph, but rather wanted to change his life. (ER 209-211,270,272,331,493.)

On August 17 Jones declared a conflict, and the public defender was relieved. (ER 153,334.) An unidentified representative of the conflict defense firm accepted the case, and spoke briefly with Moore. (ER 333-334,336,379.) On

10